## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 2024–0011** |
| | ) | |
| **MICHAEL FORD JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ———————————————————— | ) | |

**Attorneys:**
**Kyle Payne, Esq.**
St. Thomas, U.S.V.I.
 *For the United States*

**Lisa L. Brown Williams, Esq.**
St. Croix, U.S.V.I.
**Matthew A. Campbell, Esq.**
St. Thomas, U.S.V.I.
 *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Senior District Judge**

THIS MATTER comes before the Court on Defendant Michael Ford, Jr.'s ("Defendant") "Motion to Suppress Physical Evidence and Statements" ("Motion") (Dkt. No. 27); the Government's "Opposition to Defendant's Motion to Suppress Physical Evidence and Statements" ("Opposition") (Dkt. No 32); and the evidence and arguments presented at the Suppression Hearing. For the following reasons, the Court will grant in part and deny in part Defendant's Motion. Specifically, the Court will grant the Motion to the extent that Defendant seeks to suppress his statement that he did not have a license to possess a firearm, and will otherwise deny the Motion.

## I. BACKGROUND

Defendant was charged by Indictment with Possession of a Firearm by a Prohibited Person, pursuant to 18 U.S.C. § 922(g), on July 30, 2024.  (Dkt. No. 1).  The Indictment alleges that, on or about May 25, 2024, Defendant knowingly possessed a Glock .40 caliber Model 27 pistol bearing the serial number FDZ-163, which was shipped and transported in interstate commerce. *Id.*

Defendant subsequently filed the instant Motion (Dkt. No 27), seeking to suppress "all physical evidence and statements illegally taken or flowing from the illegal seizure of Mr. Ford and subsequent search of the Ford Ranger [truck]."  (Dkt. No. 27 at 1).  At the Suppression Hearing held on May 13, 2025, the Government presented the testimony of Agent Michael Jules ("Agent Jules") of the Virgin Islands Police Department ("VIPD") and Defendant testified on his own behalf.  The following facts emerged from the record established at the Suppression Hearing.[1]

Agent Jules testified that he is a 16-year veteran of the VIPD and has extensive experience handling investigations involving marijuana.  Agent Jules also testified that he has received training from the "High Intensity Drug Trafficking Area" ("HIDTA") initiative on recognizing marijuana based on both sight and odor, including both burnt and unburnt marijuana, and that he can recognize the different characteristics of marijuana.  Agent Jules further testified that he is familiar with marijuana through exposure to the smell of it on St. Croix.

Agent Jules testified that on May 25, 2024 he was working as a detective in the Sunny Isles area of St. Croix, and assisting with a "Click it or Ticket" traffic initiative near the Smoked BBQ

---

[1] The Court bases the background factual discussion in this section on the record established at the Suppression Hearing.  The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty.  Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

restaurant.  The traffic initiative was set up on the roadside and officers were stopping vehicles to provide a brochure with a QR code on seatbelt safety.  Agent Jules was attired as an officer—but not in traditional police uniform—and carrying a service weapon.

On that day, Agent Jules was completing a stop with a motorist when a white Ford Ranger truck ("the truck") came through the checkpoint and was directed by VIPD Sergeant Danisha Santos ("Sergeant Santos") to a stopping point ahead of where Agent Jules was located.  Agent Jules decided to assist with the stop of the truck when his prior stop was completed.  He observed that the front windshield of the truck was completely and heavily tinted, and that the registration sticker was an out-of-date blueish color, indicating that the registration had expired.  Defendant conceded in his testimony that the vehicle's windshield was completely tinted and that the truck's registration was expired, and further acknowledged that both of these features constitute traffic violations.

Agent Jules testified that as he approached the truck from behind the truck bed, he smelled the odor of marijuana.  Agent Jules interacted with Sergeant Santos, who had initiated the traffic stop, and observed the registration documents for the vehicle in Sergeant Santos' hand.  Sergeant Santos advised Agent Jules that the VIPD had run checks on the truck and Defendant, and had learned that the vehicle was titled to a third party; that the registration and insurance—in that third parties' name—was expired; and that Defendant did not possess a valid driver's license.  Sergeant Santos handed Agent Jules the papers that were in her hand, and he saw that the registration was expired.  As Agent Jules continued walking towards the vehicle, the marijuana odor got stronger, and he identified—from standing about one foot away—the odor as emanating from the interior of the vehicle via the driver's side window of the truck, which was slightly rolled down.

Agent Jules' and Defendant's testimonies are in conflict on the details of their interaction. Agent Jules testified that he asked Defendant if he was smoking a joint, to which Defendant replied affirmatively. Agent Jules further testified that he then asked where the joint was, and Defendant said that it was finished. Agent Jules also testified that he told Defendant to step out of the vehicle. When Defendant complied, Agent Jules directed him to stand by the rear of the vehicle—by the truck bed—with Sergeant Santos and another VIPD Officer. Agent Jules testified that Defendant was not free to leave when he was directed to get out of the truck. Agent Jules further testified that he advised Defendant that he would initiate a search of the vehicle and asked Defendant if he could search the truck, to which Defendant replied affirmatively.

In contrast, Defendant testified that he told Agent Jules that he was *not* smoking marijuana. Defendant testified that he recognized Agent Jules as a VIPD Officer although he was not in standard uniform, because he knew Agent Jules. Defendant also testified that Agent Jules ordered him to exit the vehicle. However, Defendant testified that, before complying, he asked if any officers with body cameras were in the vicinity because Agent Jules was not wearing a body camera. Additionally, Defendant asked Agent Jules for a supervisor to be present. Defendant testified that he felt threatened and was nervous for his safety in exiting the vehicle and was trying to record the interaction on his cell phone. Defendant further testified that, after being ordered to exit the vehicle several times, Agent Jules opened the door to the vehicle, and Defendant thereafter complied with the request to exit the vehicle. Defendant testified that he left the registration documents for the vehicle and his two cell phones on the driver's seat when he exited the vehicle. Defendant also testified that he was asked for his consent to search the truck, but he did *not* give such consent because he was not the owner of the vehicle. Defendant testified that while Agent Jules talked sternly to him throughout, Agent Jules did not raise his voice at Defendant. Defendant

4

also testified that neither Agent Jules nor any other VIPD Officers in the vicinity removed their firearms at any point.

Both Agent Jules and Defendant testified that there were two live chickens in the truck: one loose on the floor space in front of the passenger seat, and another in an open box sitting atop the passenger seat. Agent Jules had the chickens removed from the truck in order to search the truck, and individuals in the vicinity of the vehicle had to hold one of the chickens. Agent Jules testified that he was concerned about one of the chickens pecking him. Defendant affirmed that he talked to Agent Jules about the chickens. However, Defendant maintained that his chickens were calm, not agitated, and that conversation between Agent Jules and Defendant about the chickens revolved around having someone retrieve the chickens from the scene, rather than any general discussion about the behavior of the chickens.

Upon conducting the search of the truck, Agent Jules testified that he found a backpack to the rear of the passenger seat, slightly tucked underneath the back of the seat. He opened the backpack and saw a firearm. Agent Jules testified that he left the backpack and firearm where he found them, and exited the truck to ask Defendant if he possessed a valid license to carry a firearm in the Virgin Islands. Defendant replied that he did not, upon which Agent Jules placed Defendant in handcuffs and advised Defendant that he was under arrest for unlawful possession of a firearm. The VIPD also confirmed via radio that Defendant did not have a license to carry a firearm.

Testifying slightly differently, Defendant stated that Agent Jules approached Defendant with handcuffs in his hands after Agent Jules exited the car, and asked Defendant if he had a license to carry a firearm. Defendant testified that he did not know that the backpack was in the vehicle because the backpack was not his, and he therefore did not know about the gun or the marijuana.

5

Because the truck could not be turned over to the impound lot with two live chickens—be they calm or agitated—in the truck, Agent Jules asked Defendant what the VIPD should do with the chickens. Defendant said that he would like to make a phone call. Agent Jules testified that he then inquired as to the location of Defendant's phone, to which Defendant replied that his phone was in the bag where the gun was found. Defendant was not given his phone, because it was in a bag of evidence with the firearm. However, two women eventually arrived to collect the chickens.

Defendant notes in his Motion that he was "advised of his *Miranda* rights" after being transferred to the Wilbur H. Francis Command Police Station. (Dkt. No. 27 at 2). A VIPD forensic unit that was called to the scene to process the vehicle identified the handgun as a Glock 27, .40 caliber handgun pistol with an extended 22 round capacity magazine with 20 live rounds and a second 13 round capacity magazine containing 12 live rounds. (Dkt. No. 32 at 2). The backpack also contained "marijuana, bamboo papers, and two empty vials." (Dkt. No. 27 at 2).

Defendant alleges that his Fourth and Fifth Amendment rights were violated by the Government, and requests that the Court deem inadmissible at trial any evidence obtained from the search and seizure, "includ[ing], but [] not limited to . . . all physical evidence and statements illegally taken or flowing from the illegal seizure of [Defendant] and [the] subsequent search of the Ford Ranger [truck]." (Dkt. No. 27 at 1). Defendant makes four arguments in support of his Motion. First, Defendant argues that the VIPD did not have reasonable suspicion or probable cause to initiate the traffic stop. *Id.* at 2-3, 5. Second, Defendant argues that his statements made during the traffic stop should be suppressed as fruit of the poisonous tree and *Miranda* violations. *Id.* at 2-3, 8. Third, Defendant argues that the VIPD had neither consent nor probable to conduct a warrantless search of the truck that Defendant was driving or the backpack found therein. *Id.* at 2, 5-6. Fourth, Defendant argues that his post-arrest statements about not possessing a license to

carry a firearm and the location of his phone should be suppressed as fruit of the poisonous tree and *Miranda* violations. *Id.* at 3, 8.

## II. APPLICABLE LEGAL STANDARDS

### A. Probable Cause

An arrest is a "seizure of persons" which, under the Fourth Amendment, "must be reasonable under the circumstances." *D.C. v. Wesby*, 583 U.S. 48, 56 (2018). A warrantless arrest is "reasonable" if the law enforcement officer has probable cause to believe that a crime was committed by the individual in the officer's presence. *Id.* To make this determination, Courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable [law enforcement officer], amount to probable cause." *Id.* at 56-57. This standard of probable cause is "not a high bar" because probable cause is "a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules" and which "deals with probabilities and depends on the totality of the circumstances." *Id.* at 57. In sum, "[p]robable cause exists whenever reasonably trustworthy information or circumstances within a [law enforcement] officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Fernandez*, 652 F. App'x 110, 113 (3d Cir. 2016). "[This] standard of probable cause 'applie[s] to all arrests, without the need to balance the interests and circumstances involved in particular situations.'" *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id.*

### B.    *Terry* **Stop**

The Supreme Court established in *Terry v. Ohio* that an officer lacking a warrant or probable cause may conduct what is commonly referred to as a "*Terry* stop"—a brief, investigatory stop when the "officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (first citing *Terry*, 392 U.S. 1 (1968), *and then* quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  Under *Terry*, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009).

### C.    **Automobile Exception**

"The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)); *see also United States v. Donahue*, 764 F.3d 293, 295 (3d Cir. 2014) ("The Supreme Court has interpreted—and reinterpreted—the automobile exception so expansively that the Court essentially has obviated the requirement that the government obtain a warrant to search a vehicle provided it has probable cause to believe that the vehicle contains evidence of a crime.").  Further, "[w]hile a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the 'ready mobility' of automobiles permits their search based only on probable cause." *Burton*, 288 F.3d at 100.  Because there is no exigency requirement, "probable cause does not dissipate after the automobile is immobilized." *Donahue*, 764 F.3d. at 300.  Accordingly, a vehicle can be searched without a warrant once probable cause exists "even though [the government] has secured the

vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id.* This ability to search an automobile extends to "the containers within [the automobile] where [the police] have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "'[T]he smell of marijuana alone, if articulable and particularized' may establish[] probable cause, so long as the officer can localize its source with sufficient particularity." *United States v. Wimbush*, 2020 WL 1873020 at *17 (D.N.J. Apr. 15, 2020) (quoting *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)).

### D.    *Miranda* Rights

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. The Supreme Court in *Miranda v. Arizona* held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). "When the police fail to give adequate *Miranda* warnings any statement made by the individual who is subject to custodial interrogation is inadmissible at trial." *United States v. Woodley*, 2021 WL 1082225 at *4 (D.V.I. Mar. 20, 2021).

*Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010). Because the defendant must be both in custody and subject to an interrogation to trigger Miranda warnings, "in the absence of one or the other, Miranda is not implicated." *Gov't of Virgin Islands v. Christopher*, 990 F.Supp. 391, 393-94 (D.V.I. 1997).

There is a three step inquiry for determining when a defendant is in custody. *U.S. v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019); *see also U.S. v. Columna*, 2024 WL 4182588 at *4 (3d Cir. Sept. 13, 2024) (same). First, the Court establishes "the circumstances surrounding the interrogation." *Id.* Then the Court examines "as an objective matter, whether 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Id.* In other words, whether the defendant experienced a "restraint on freedom of movement of the degree associated with a formal arrest[.]" *Id.* Finally, the Court asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*.

A person in custody is "interrogated" when they are "subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Thus, "interrogation" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301.

For *Miranda* purposes, "the usual traffic stop is more analogous to a so-called '*Terry* stop' . . . than to a formal arrest," therefore "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (citation omitted). As such pursuant to a traffic stop, officers may ask questions related to "tasks ordinarily [] tied to the mission of a traffic stop" without triggering *Miranda*, including, *inter alia*, "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance[.]" *See U.S. v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020). However, if "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for

practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440.

Finally, "[v]olunteered statements of any kind are not barred by the Fifth Amendment"; thus "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Innis*, 446 U.S. at 299-300 (quoting *Miranda*, 384 U.S. at 478).

### E.    Fruit of the Poisonous Tree

The remedy for violations of the Fourth Amendment is to "suppress" evidence at trial under the exclusionary rule. *Weeks v. United States*, 232 U.S. 383, 398 (1914); *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The exclusionary rule "encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (citation modified).

"The violation of an individual's Fourth Amendment rights, however, does not always guarantee suppression of evidence derived from an illegal search." *United States v. Caesar*, 2 F.4th 160, 167 (3d Cir. 2021); *see also United States v. Leon*, 468 U.S. 897, 906 ("Whether the exclusionary sanction is appropriately imposed in a particular case is . . . 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983))). For the exclusionary rule to apply, the constitutional violation must be the "but-for cause" of the discovery of evidence. *Segura v. United States*, 468 U.S. 796, 815 (1984) ("[O]ur cases make clear that evidence will not be excluded . . . unless the illegality is at least the 'but for' cause of the discovery of the evidence."). The suppression remedy is "an extreme sanction that carries significant costs," so it "has always been [the Court's] last resort, not our first impulse." *Caesar*, 2 F.4th at 167.

### F.    Standard of Review

Generally, "[o]n a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).  The "controlling burden of proof at suppression hearings" is "a preponderance of the evidence."  *United States v. Matlock*, 415 U.S. 164, 177 & n.14 (1974).

### G.    Credibility Determinations

"In deciding a motion to suppress evidence, the trial court determines the credibility of witnesses."  *United States v. Demings*, 787 F.Supp.2d 320, 326 (D.N.J. 2011); *see also United States v. Boyce*, 2015 WL 856943 at *8 (D.V.I. Feb. 26, 2015) ("At a suppression hearing . . . the Court determines the credibility of witnesses and may accept or reject any or all of a witness' testimony." (quotations omitted)).   "The Court judges credibility by considering a number of factors, including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the 'common sense test.'"  *United States v. Williams*, 2018 WL 4781174 at *7 (D.V.I. Oct. 2, 2018).  "A witness should not be considered any more or less credible because the witness is a law enforcement officer."  *Id.* (citation modified).

### III. DISCUSSION

### A.    Validity of the Traffic Stop

Defendant claims that he was "illegally seized in violation of his Fourth Amendment rights when the [VIPD] officers detained him roadside in the Sunny Isle area."  (Dkt. No. 27 at 2).

Police checkpoints wherein the police stop motorists on a roadway are not presumptively unconstitutional under the Fourth Amendment. *Illinois v. Lidster*, 540 U.S. 419, 426 (2004). The "reasonableness" must be judged "on the basis of the individual circumstances" of the traffic checkpoint. *Id.* Checkpoints conducted for "vehicle inspections"—such as compliance with seatbelt laws under the instant "Click it or Ticket" initiative—do "not violate the Fourth Amendment." *United States v. Bell*, 483 F. App'x 716, 717-18 (3d Cir. 2012). Although seemingly not challenged, there was clearly no impropriety with the traffic checkpoint.

When a vehicle is stopped pursuant to a traffic checkpoint, "the [police] officers [are] in the proper position to observe any traffic violation," and may "properly stop[]" a vehicle "because of such a violation." *Id.* at 718; *see also United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ("It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Traffic violations for which officers may initiate a traffic stop include excessively tinted windows. *See United States v. Colen*, 482 F. App'x 710, 713 (3d Cir. 2012) ("The police officers had a valid basis to stop [defendant] for investigation of a motor vehicle code violation because he was driving an automobile with excessively tinted windows."). Officers may also initiate a traffic stop based upon an expired registration sticker. *Perry v. Faddis*, 2023 WL 144432 at *4 (E.D. Pa. Jan. 10, 2023) ("[A] violation of traffic laws observed by an officer, such as an expired registration sticker on a car's license plate, is a permissible reason for a traffic stop.").

"Reasonable suspicion" that "a traffic violation has occurred" is sufficient to support a traffic stop. *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) ("Traffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred."). Thus, even absent an Officer's ability to definitively establish a traffic violation—

13

such as the precise degree of tint of the windshield—reasonable suspicion that a traffic violation has occurred is sufficient. *Id.* ("The operative question is whether [the Officer] had a reasonable suspicion that [the suspect] was speeding, not whether [the Officer] could determine [the suspect's] exact speed.").

Here, there is no challenge to Agent Jules' testimony—which the Court credits—that he observed that the truck had a fully and heavily tinted front windshield and an expired registration sticker. Accordingly, the circumstances presented here establish—undeniably—that Agent Jules had reasonable suspicion of the occurrence of traffic violations to justify the traffic stop. *See Woodley*, 2021 WL 1082225 at *5. The traffic stop was therefore lawful.

## B.  Defendant's Statements Before Exiting the Truck

Because the traffic stop was lawful, Agent Jules was permitted to "temporarily detain" Defendant without the Defendant being placed 'in custody' or subject to "a formal arrest." *See Berkemer*, 468 U.S. at 439-40 ("the usual traffic stop is more analogous to a so-called '*Terry* stop' . . . than to a formal arrest," therefore "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." (citation omitted)). When a police officer makes a traffic stop, the police officer may also ask the driver for his license and registration. *Colen*, 482 F. App'x at 713 ("[O]nce police made the valid traffic stop of the car [defendant] was driving, they quite properly asked him for his license and registration."); *see also Garner*, 961 F.3d at 271 (holding that pursuant to a traffic stop, an officer may ask questions related, *inter alia*, to "checking the driver's license . . . and inspecting the automobile's registration and proof of insurance[.]"). In addition, the police "may order the driver of a lawfully stopped car to exit the vehicle." *Moorefield*, 111 F.3d at 12. Accordingly, Agent Jules' request for Defendant to exit the vehicle was also permissible within the scope of the traffic stop.

14

That Agent Jules "questioned Defendant about the smell of marijuana emanating from his vehicle as soon as he rolled his window down does not render the stop unlawful." *United States v. Augustus*, 590 F.Supp.3d 767, 777 (E.D. Pa. 2022); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *United States v. Brabham*, 2024 WL 897834 at *5 (M.D. Pa. Mar. 1, 2024) ("[T]he smell of marijuana alone was sufficient to establish reasonable suspicion to extend the traffic stop and inquire about this smell."). Accordingly, the Court will not suppress any of the statements—including those relating to smoking marijuana—that Defendant made in response to Agent Jules' questions prior to Defendant being asked to step out of the vehicle, because Agent Jules' questions were permissible pursuant to the lawful traffic stop.

### C.    The Search of the Truck

Defendant claims that "[a]t the time the officers searched the vehicle, the officers had no probable cause to believe that any criminal activity was afoot."  (Dkt. No. 27 at 2).  This argument fails.

"It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)); *United States v. Jackson*, 682 F. App'x 86, 88 (3d Cir. 2017) ("[S]o long as the smell of marijuana can be particularized to a specific person or place, it is sufficient to establish probable cause."); *see also Bell*, 483 F. App'x at 718 (affirming a district court's ruling on the permissibility under the Fourth Amendment of an expansion of a traffic stop based upon the smell of marijuana); *United States v. Staula*, 80 F.3d 596, 602 (1st Cir. 1996) ("[W]hen a law

enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area.").  When such a "particularized and articulable" odor of marijuana has been identified "emanating from the interior of the vehicle"— thereby establishing "the requisite probable cause to conduct a warrantless search"—the officer may then search the vehicle from which the smell of marijuana is emanating pursuant to "the automobile exception to the Fourth Amendment's warrant requirement."[2]  *United States v. Wimbush*, 2020 WL 1873020 at *17 (D.N.J. Apr. 15, 2020).

In cases where the Court has found probable cause based on the smell of marijuana emanating from the vehicle, officers have testified with precision as to the smell of the marijuana. *Woodley*, 2021 WL 1082225 at *5 ("Officer Marshall further testified that '[i]t was a very potent marijuana smell coming from the car' and that it was so potent he 'could smell it from outside the vehicle.'").  The identification of the smell has been based on the combination of the officer's years of training and experience with cases involving marijuana. *Id.* ("Both VIPD officers testified that they were able to identify the smell of unburnt marijuana based on their years of training and experience with handling and investigating cases involving marijuana.").  Agent Jules testified that he smelled the odor of marijuana first as he approached the vehicle; that the odor got stronger as he approached the driver's side of the truck; that he smelled the marijuana coming from the interior of the vehicle via the window that was slightly rolled down on the driver's side of the truck; and

---

[2] The Court notes that a panel of the Third Circuit recently held that "while the smell of marijuana alone can create probable cause to search a vehicle, there must be facts that connect the smell to an individual passenger for there to be probable cause to arrest that passenger." *United States v. Outlaw*, 2025 WL 1510857 at *3 (3d Cir. May 28, 2025).  However, "[w]hen the odor is particularized to a vehicle, and an individual is alone in that vehicle," such as in the instant case, "this distinction is immaterial." *Id.*

that the odor was stronger as Defendant exited the vehicle. Agent Jules also testified regarding his experience identifying the smell of marijuana through HIDTA classes, his experience with investigations involving marijuana, and his encounters with marijuana in publics spaces on St. Croix. He testified that he identified the smell emanating from Defendant's vehicle as marijuana based upon his training and experience, and that he had no doubt that the odor was marijuana. Agent Jules' testimony was thus particularized and specific, and his identification of the odor as marijuana was based upon his training and experience. This is sufficient to support probable cause to search the vehicle under the automobile exception. *See Ramos*, 443 F.3d at 308; *Jackson*, 682 F. App'x at 88; *Bell*, 483 F. App'x at 718; *Staula*, 80 F.3d at 602; *Wimbush*, 2020 WL 1873020 at *17; *Burton*, 288 F.3d at 100.

However, here, Defendant testified that he told Agent Jules that he was not smoking marijuana, while Agent Jules testified both to an odor of marijuana being present and to Defendant verbally confirming that Defendant was smoking marijuana. Thus, "[i]n view of the conflicting testimony" between Agent Jules and Defendant regarding their interaction, "the Court is required to make a credibility determination" before concluding that probable cause existed. *Williams*, 2018 WL 4781174 at *7; *see also United States v. Frisby*, 474 F. App'x 865, 867 (3d Cir. 2012) ("It was well within the District Court's discretion to make such credibility determinations . . . . where, as here, two plausible versions of the same incident are presented." (citation modified)).

Courts sometimes look for corroborating evidence suggesting the presence of marijuana in a vehicle when making a credibility determination regarding the smell of marijuana. *See United States v. Harris*, 2023 WL 5425395 at *5 (D.N.J. Aug. 23, 2023) (finding Officers' testimony regarding a marijuana smell credible where "[t]he Officers' testimony was coherent, facially plausible, and internally consistent with the evidence in the record"). In this case, Defendant's

17

Exhibit F depicts three sandwich baggies filled with raw marijuana found in the truck and a box of Bambú rolling papers. (Dkt. No. 49; Ex. F). Thus, Agent Jules' testimony is "internally consistent with the evidence in the record." *Harris*, 2023 WL 5425395 at *5. Agent Jules also testified both that he smelled the odor of marijuana growing stronger as he approached the truck and immediately asked Defendant a question related to the marijuana, acting upon his suspicion that Defendant had been smoking marijuana. *Cf. United States v. Harrison*, 2018 WL 4405892 at *8 (E.D. Pa. Sept. 17, 2018) ("Nor does the officers' conduct support their testimony regarding the smell of marijuana. Despite stating that they immediately could smell marijuana, the officers did not immediately act on their suspicion. Neither officer inquired about the smell or commented on it to one another. Nor did the officers testify to the smell becoming stronger as they were in closer proximity to the marijuana[.]"). Defendant does not deny that the question about marijuana was asked; Defendant only disputes the answer that he gave. Further, courts may credit the testimony of an officer as to the smell of marijuana given that "[t]he pungent odor of any smoked item can linger in a vehicle for quite some time." *United States v. Chapman*, 2023 WL 4058927 at *14 (W.D. Pa. June 17, 2023).

Additional factors that support a witness's credibility include: (1) whether their "demeanor on the stand" is "calm and collected"; (2) whether they can "recount[] events in an organized and cogent manner"; (3) whether their "demeanor remain[s] the same" even when "challenged" on cross-examination; and (4) whether they are "able to recall the matter at hand in considerable detail, demonstrating a clear and consistent recollection of events."[3] *Williams*, 2018 WL 4781174 at *7-8.

---

[3] Factors that undercut a witness's credibility include: (1) erosion in the level of detail with which the witness describes their recollection of events; and (2) lack of memory regarding key events. *Williams*, 2018 WL 4781174 at *8. Agent Jules' testimony did not reflect any of these concerns.

Agent Jules was "calm and collected" during his testimony at the Suppression Hearing—including on cross-examination—and he "recounted events in an organized and cogent manner" with "considerable detail" in a "consistent" manner. *Id.*; *see also Harris*, 2023 WL 5425395 at *5 (credibility is supported where "[t]he Officers' testimony was coherent[] [and] facially plausible"). The Court finds that Agent Jules' testimony regarding the marijuana odor emanating from the vehicle was credible. Thus, the Court concludes that "the evidence presented at the suppression hearing [established] that there was an articulable and particularized odor of marijuana sufficient to establish probable cause to search the vehicle." *Woodley*, 2021 WL 1082225 at *6.[4]

### D. The Search of the Backpack in the Vehicle

"Where the automobile exception applies, its authorization extends to 'every part of the vehicle and its contents that may conceal the object of the search.'" *United States v. Matthews*, 597 F.Supp.3d 694, 703 (D.N.J. 2022); *see also United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014) ("The broad sweep of the automobile exception is of controlling significance in this case because if we determine, as in fact we do, that the government had probable cause to seize and search the Mustang . . . [then] the government was justified in opening the bag found in the Mustang's trunk containing the pistol."); *Acevedo*, 500 U.S. at 580 ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained[.]"). Having probable cause to search the vehicle, Agent Jules also possessed probable cause to search anywhere in the vehicle where marijuana might be found, including the backpack tucked underneath the back of the passenger seat. *See United States v.*

---

[4] Because the Court finds that there was probable cause to search the automobile given the smell of marijuana, the Court does not need to reach the issue whether Defendant provided Agent Jules with consent and the credibility determination necessitated by their differing accounts of those facts.

*Harrison*, 2018 WL 1325777 at *3 (D. Del. Mar. 15, 2018) ("Therefore, the automobile exception to the Fourth Amendment's warrant requirement is satisfied because the smell of marijuana was particularized and articulable, thus establishing the requisite probable cause to conduct a search of [Defendant]'s entire vehicle and bags within.").

In view of the foregoing, the Court will not suppress any of the physical evidence found within the vehicle—including the contents of the backpack.

### E.    Defendant's Statements After Exiting the Truck

Defendant claims that "any and all statements made" by Defendant "must [] be suppressed as they were elicited in violation of his Fifth Amendment rights."[5]  (Dkt. No. 27 at 2-3).  Defendant made two statements to Agent Jules after exiting the truck: (1) after the gun was found, Defendant made a statement that he did not possess a license for the firearm in response to Agent Jules' question; and (2) after Defendant was arrested, Defendant stated his phone was located in the backpack with the firearm.  The Government argues that because Defendant "was not in custody for *Miranda* purposes, his statement regarding the firearm license was not obtained in violation of the Fifth Amendment."  (Dkt. No. 32 at 5).  The Government further argues, "[r]egarding the defendant's request for his phone and statement of where it was located, those were merely voluntary statements that he initiated."  *Id.* at 6.

Neither party disputes that Defendant had not received *Miranda* warnings for either statement.  Thus, the inquiry is whether Defendant was (1) "taken into custody" and (2) was subject to "interrogation" by the Government such that *Miranda* warnings should have been provided prior

---

[5] Defendant also claims that "any and all statements made by [Defendant] must be suppressed as fruits of an illegal search and seizure."  (Dkt. No. 27 at 2-3).  However, as the Court has not found either an illegal search or an illegal seizure to have occurred, this is not a valid basis for suppression of Defendant's statements.

to eliciting the statements. *Steigler*, 496 F.2d at 798. Alternatively, if either statement is a "volunteered statement" made by Defendant—"given freely and voluntarily without any compelling influences"—then the statement does not fall within the protections of the Fifth Amendment. *Innis*, 446 U.S. at 299-300 (cleaned up).

The first statement, regarding the firearms license, is substantially similar to the circumstances in *United States v. Woodley*, in which a VIPD Officer found a firearm pursuant to a traffic stop and asked whether Woodley had a license for the firearm. 2021 WL 1082225 at *2. There, the Court found that Woodley was subject to interrogation:

> "*Miranda* safeguards come into play whenever a person in custody is subjected to either *express questioning* or its functional equivalent." Officer Marshall's direct question as to whether Defendant had a firearms license was of the nature that Officer Marshall "*should have known* w[as] reasonably likely to elicit an incriminating response." . . . Therefore, the Court finds that Defendant was subject to interrogation by the Government for *Miranda* purposes.

*Woodley*, 2021 WL 1082225 at *7-8 (D.V.I. Mar. 20, 2021) (citations omitted). As with the identical question in *Woodley* as to "whether Defendant had a firearms license," Agent Michael Jules "should have known [this question] w[as] reasonably likely to elicit an incriminating response." *Id.* at *7. Indeed, in a separate case, this Court has previously found that "[then-]Officer [Michael] Jules should have known that the question was reasonably likely to elicit an incriminating response" when asking a defendant arrested for possession of a firearm "whether he has, or ever had, a license to carry a firearm in the Virgin Islands." *United States v. Felix*, 2021 WL 3272201 at *9 (D.V.I. July 29, 2021). Accordingly, the Court concludes that Defendant was subject to interrogation by Agent Jules.

Under the circumstances here, the Court also concludes that Defendant was in custody. Defendant had been directed by Agent Jules to stand by the truck bed of his vehicle with two VIPD Officers while Agent Jules searched his truck. *See Ludwikowski*, 944 F.3d at 131 ("To determine

whether an individual was in custody, we first establish 'the circumstances surrounding the interrogation.'").  Although the testimonies of Agent Jules and Defendant differed as to exactly when Agent Jules displayed his handcuffs, Defendant testified, nonetheless, that he did not feel free to leave even before he saw the handcuffs in Agent Jules' hands.  A reasonable person surely would not have felt free to leave under circumstances where—as here—Defendant had been stopped while driving a vehicle with expired insurance and registration; the vehicle did not belong to him; he was without a valid driver's license; and he had been asked about smoking marijuana. *See id.* ("Then we ask, as an objective matter, whether 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'").  Indeed, Agent Jules himself testified that Defendant was not free to leave from the time that Agent Jules ordered him to exit the vehicle.  Overall, the environment suggests that both Defendant and Agent Jules understood that the circumstances were such as to present the type of coercive environment with similar concerns as the station house questioning at issue in *Miranda*. *Id.* ("We must 'ask the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'").  These facts weigh strongly in favor of the conclusion that Defendant was in custody.  Because Defendant was in custody and subject to interrogation without the requisite *Miranda* warnings, the Court will suppress Defendant's statement that he did not have a license to possess the firearm.

The second statement, regarding the location of Defendant's phone "in the bag where you found the gun," (Dkt. No. 32 at 2), was similarly made while Defendant was in custody.  Both Defendant and Agent Jules testified that Defendant asked about his phone in response to Agent Jules' initiation of a conversation regarding how to handle the continuing care of the two live chickens in the truck prior to impounding the vehicle.  After Defendant asked to make a call related

to the care of the chickens, Agent Jules asked him where his phone was located, and Defendant identified the location of the cell phone as "in the bag where you found the gun." *Id.*

The question "where is your phone" is not a "question [] reasonably likely to elicit an incriminating response." *See United States v. Chandler*, 164 F.Supp.3d 368, 387 (E.D.N.Y. 2016) ("If, as the Government contends, the Defendant asked the Officer whether he could make a call, the Officer's question, 'do you want to use your cell phone,' appears to be a reasonable response to the Defendant's initial question and not a question designed to elicit incriminating information."). Agent Jules' question regarding the location of Defendant's phone was reasonably aimed at assisting Defendant in securing continuing care of the two chickens in the truck prior to impounding the vehicle.

However, here, Defendant testified that he left his phone on the front seat of the Ford Ranger truck, along with the vehicle's expired registration, when he stepped out of the vehicle at Agent Jules' direction. On the other hand, Agent Jules testified that Defendant told him that his phone was in the backpack. Thus, "[i]n view of the conflicting testimony" between Agent Jules and Defendant regarding their interaction, "the Court is required to make a credibility determination" regarding the existence of the statement before determining whether the statement should be suppressed. *Williams*, 2018 WL 4781174 at *7; *see also Frisby*, 474 F. App'x at 867 ("It was well within the District Court's discretion to make such credibility determinations . . . . where, as here, two plausible versions of the same incident are presented." (citation modified)).

In addition to all the factors noted above that support Agent Jules' credibility, two Exhibits admitted during the Suppression Hearing corroborate Agent Jules testimony. First, Defendant's Exhibit B is a photograph that shows the front seat of the truck with the door open and a stack of title and registration papers on the front seat of the truck. (Dkt. No. 49; Ex. B). The box that

23

previously contained a live chicken is visible atop the passenger's seat. (Ex. B). No phone is visible in the photo—much less the two phones that Defendant testified to leaving on the driver's seat along with the registration papers. *Id.* Second, Government Exhibit 10 is a photograph that shows a forensic technician's hand reaching into the backpack and lifting upwards a sandwich baggie filled with marijuana. (Dkt. No. 49; Ex. 10). The magazine of the gun is visible at the top of the bag, with a second sandwich baggie of marijuana underneath the magazine. (Ex. 10). Two phones are visible underneath the second sandwich baggie of marijuana. *Id*. This undercuts Defendant's testimony that he left his phones on the driver's seat when exiting the vehicle and bolsters the credibility of Agent Jules' testimony that Defendant said his phone was located in the backpack where the gun was found. *Cf. United States v. Mullins*, 2018 WL 7635210 at *2 (E.D. Pa. Dec. 21, 2018) (finding an officer's testimony "credible in all respects" when "supplemented" with "an overhead photographic map of the area and ground-level photographs of the path of the pursuit"). The Court therefore credits Agent Jules' testimony that Defendant answered Agent Jules' question regarding the location of Defendant's phone with a statement that indicated his phone was located in the backpack with the firearm.

Accordingly, the Court will not suppress Defendant's statement regarding his phone being in the backpack with the gun because it was in response to a question not "reasonably likely to elicit an incriminating response," and therefore does not implicate *Miranda*.

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Defendant's Motion to Suppress.  The Court will suppress Defendant's statement that he did not have a license to possess a firearm, but otherwise deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 24, 2025

_____/s/_____
WILMA A. LEWIS
Senior District Judge